**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

LEILA DIAB,                                              )
                                                        )
                    Plaintiff,                          )
                                                        )
            v.                                          )        No. 10 C 4870
                                                        )        Hon. Marvin E. Aspen
CHICAGO BOARD OF EDUCATION, and                         )
GEORGE SZKAPIAK,                                        )
                                                        )
                    Defendants.                         )

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Presently before us is a motion for summary judgment filed by Defendants Chicago

Board of Education and George Szkapiak, seeking dismissal of the eight-count complaint against

them filed by Plaintiff Leila Diab. Diab alleges that Defendants discriminated and retaliated

against her, and subjected her to a hostile work environment, on the basis of her age, national

origin, race and religion. For the reasons set forth below, we grant the motion in part, and deny

it in part.

**I.      INTRODUCTORY BACKGROUND**[1]

Diab is a sixty-four year old Arab woman and an observing Muslim of Palestinian

national origin. (Defs.' Facts ¶ 1.) In 2002, Diab was hired to teach social studies and English

---

[1] The facts described herein are undisputed and culled from the parties' Local Rule 56.1
statements of fact and accompanying exhibits. In addition, Diab filed a motion to strike certain
portions of Defendants' response to her statements of fact. (Mot. to Strike, Dkt. No. 62.) The
parties agree that Defendants' remaining objections primarily concern the relevance of the
disputed statements. (Resp. Mot. to Strike, Dkt. No. 65 & Reply Mot. to Strike, Dkt. No. 66.)
We shall consider the disputed material, where appropriate, to resolve the motion for summary
judgment. We need not address the motion to strike separately, however, and deny it as moot.

as a second language ("ESL") at John F. Kennedy High School ("Kennedy").  (*Id.* ¶ 2.)  She continued to work for the Chicago Board of Education as a tenured teacher until her resignation on December 20, 2010.  (*Id.* ¶ 1.)  At the time she resigned, Diab had not yet completed her seventeenth year in the Chicago school system.  (Pl.'s Facts ¶ 83 & Diab Dep. at 246.)

In July 2008, George Szkapiak became principal at Kennedy.  (Defs.' Facts ¶ 3.)  Diab and Szkapiak had previously worked together at Richards Career Academy, where they had maintained an amicable working relationship.  (*Id.* ¶ 4.)

## II.    DIAB'S PERFORMANCE AT KENNEDY

Prior to Szkapiak's arrival at Kennedy, Diab's evaluations rated her as either Superior or Excellent.  (Pl.'s Facts ¶ 45.)  Nonetheless, Diab's supervisors towards the end of her tenure felt her performance was inadequate in several ways.  We will first address issues regarding her teaching skills, including her classroom management and grading practices.[2]  We will then review numerous interpersonal conflicts she identifies in support of her discrimination claims.

### A.    Teaching Skills

In reviewing the materials before us, we discern two types of alleged concerns about Diab's substantive work: her classroom management skills and grading practices.

#### I.    *Classroom Performance and Student Disruptions*

The record indicates that Diab's supervisors felt that she lacked sufficient classroom skills.  For example, Assistant Principal Soledad Ruiz, who observed Diab's classes on roughly five occasions, felt that Diab had problems with classroom management.  (Ruiz Dep. at 86, 88,

---

[2] Although the parties dispute a series of events from October 2008, generally concerning Diab's attendance record, these facts are immaterial.  Diab does not rely on the October 2008 incidents in support of her claims.  As such, we omit them.

90–93, 103–04.)  Ruiz further testified that Diab ranked in the bottom 10% of teachers at Kennedy.  (*Id.* at 167–68.)  Assistant Principal Christopher Pawelczyk observed Diab's teaching at least seven times beginning with the 2008-2009 year and similarly concluded that Diab was not a strong teacher.  (Pawelczyk Dep. at 33–36.)  Pawelczyk found that Diab's teaching was fragmented and failed to challenge the students, leaving the class unengaged.  (*Id.* at 36.)

Based on his frequent observations, Szkapiak also identified numerous issues with Diab's in-class performance, such as a lack of connection and/or chronological flow between her lessons, flawed or ineffective instructions to the class, and inaccurate attendance recordkeeping. (Szkapiak Dep. at 87–112.)  Szkapiak testified that many students requested to transfer out of Diab's class—moreso than any other teacher—although he did not document these informal conversations.  (*Id.* at 164–65.)  On November 2, 2009, Szkapiak sat in on Diab's world studies class.  (*Id.* at 103.)  Diab had planned for the class to hold a Jeopardy-style review session.  (*Id.* at 105.)  Szkapiak felt that Diab's instructions to the class were unclear, resulting in the use of significant class time (more than half) to set up the game logistically.  (*Id.* at 105–07.)  In addition, as he later discussed with her, Szkapiak found that Diab frustrated the class when she rejected an answer provided by the textbook.  (*Id.* at 108–09.)  Specifically, one question asked the student to identify Jesus Christ's religion, and the student responded that Jesus had been born into Judaism per the textbook.  (*Id.* at 108.)  Diab then corrected the student, noting that different sources present multiple views on the matter.  (*Id.*; *see also* Pl.'s Facts ¶ 63.)  Diab perceived Szkapiak's critique as discriminatory; he testified, however, that his point was that Diab needed to have a "right or wrong answer" based on the class materials for the quiz format to be effective and engaging.  (Szkapiak Dep. at 108–09; Pl.'s Facts ¶ 63.)

While Szkapiak, Ruiz and Pawelczyk felt Diab's teaching was insufficient, several of Diab's colleagues share a different opinion. Jason Kelly, a science teacher at Kennedy, and Tim Kelly, an English teacher, both felt that Diab was a good teacher who was able to keep her students on task. (Pl.'s Facts ¶¶ 46–47; J. Kelly Dep. at 58–61.) Tim Kelly recommended Diab for the Chicago Teacher's Union Women's History Month Award, which she received in 2007. (Pl.'s Facts ¶ 46; *see also* Pl.'s Facts, Ex. R, T. Kelly Ltr.) Khetam Khairallah, another social studies teacher, had regular opportunities to observe Diab's classes from 2005 through 2008 and felt that Diab had a good rapport with her students and good classroom management. (Khairallah Dep. at 65–66.) While praising Diab's skills, Khairallah noted that beginning with the 2009-2010 school year, Diab faced escalating problems with classroom management. (*Id.* at 66.) In fact, generally speaking, it is undisputed that Diab began having greater difficulty with student conduct during her last few school years, which shall be discussed in greater detail below.

### a. *2008 – 2009 School Year*

During the 2008-2009 school year, Diab asked Szkapiak for help with an increasing number of classroom disruptions. (Pl.'s Resp. to Defs.' Facts ¶ 22.) Diab sought suggestions on classroom management and discipline but Szkapiak did not offer anything she didn't already know. (Diab Dep. at 183.) On March 24, 2009, the majority of students in Diab's class became unruly, refusing to listen to her after another student acted out, and Diab requested back-up. (Pl.'s Facts, Ex. Q (Diab 3/24/09 Notes) at 1.) Szkapiak arrived, heard about the situation, and stepped in to teach the remainder of the class—including assigning homework and returning to collect it the following day. (*Id.*; Diab Dep. at 181–82; Szkapiak Dep. at 130–34.) Diab, as well

as two fellow teachers, perceived that Szkapiak's response was disrespectful and undermined her authority.  (Pl.'s Facts. Ex. Q (Diab 3/24/09 Notes) at 3; Khairallah Dep. at 71; T. Kelly Dep. at 63.)  Szkapiak did not recall ever taking over another teacher's class while principal at Kennedy. (Szkapiak Dep. at 133–35.)

Szkapiak returned to observe this class two days later.  Moreover, Diab testified that Szkapiak sat in on her classes four days a week for three consecutive months during that school year.  (Diab Dep. at 238–40.)  Although Szkapiak disputes this reported frequency, there is no dispute that Szkapiak observed Diab's teaching more often than any other instructor.  (Pl.'s Resp. to Defs.' Facts ¶ 25.)

> b.    2009 – 2010 School Year

In September 2009, Diab had a particularly unruly student, D.A., in her 8th period world studies class.  (Pl.'s Facts, Ex. P (9/30/09 Diab Notes); Szkapiak Dep. at 138–40; Diab Dep. at 175–77.)  D.A. disrupted classes for others teachers and assaulted Diab on three occasions. (Pl.'s Facts, Ex. P (9/30/09 Diab Notes); Szkapiak Dep. at 138–40; Diab Dep. at 179–80.) According to Diab, D.A. became increasingly disrespectful and disruptive in the middle of September and then threw a pencil at her on September 23, 2009.  (Pl.'s Facts, Ex. P (9/30/09 Diab Notes) at 1.)  He then disappeared; when she looked for him and began to close the classroom door, he yanked it closed from the other side (where he was lurking), injuring her arm. (*Id.*; Diab Dep. at 177.)  D.A. returned to class on September 29, 2009, at which time he stood near Diab's desk, picked up her stapler, and began throwing staples at her.  (Pl.'s Facts, Ex. P at 1–2 (9/30/09 Diab Notes); Diab Dep. at 176.)  Security removed him, and he was transferred

to another class.[3]  (Pl.'s Facts, Ex. P (9/30/09 Diab Notes) at 2; Diab Dep. at 177; Szkapiak Dep. at 138–39.)  Diab expressed fear for her own safety and yet, on the other hand, also felt that the Kennedy administration should have helped her facilitate a meeting between her and D.A. and/or his guardian to try and resolve the situation.  (Pl.'s Facts, Ex. P (9/30/09 Diab Notes) at 1–2; Diab Dep. at 178–79; *see* Pl.'s Resp. to Defs.' Facts ¶ 21.)

Diab's problems with this world studies class continued after D.A. departed, however.  In October 2009, students tore off the front and back covers of her mother of pearl Quran, which she had brought to complement her lesson.  (Pl.'s Facts ¶ 61.)  Diab requested that Pawelczyk speak to her class about this matter.  (*Id.*)  Although Pawelczyk observed the class, he did not address the students.  (*Id.*; *see also* Pawelczyk Dep. at 70–73.)  Pawelczyk felt that Diab handled the situation well and that he need not do more than support her with his presence.  (Pawelczyk Dep. at 72–73; Pl.'s Facts Ex. P (9/30/09 Diab Notes) at 4.)

In November 2009, a student reported that Diab called another student "gay."  (Defs.' Facts ¶ 32.)  Szkapiak immediately investigated, speaking with both Diab and another student witness.  (Szkapiak Dep. at 147–51.)  He concluded that there was no support for the allegation and took no further action.  (*Id.* at 150–51; *see* Pl.'s Resp. to Defs.' Facts ¶ 32.)

Diab's troubles with her world studies class came to a head in January 2010.  Students had belittled, ignored and insulted her on several occasions.  (Pl.'s Facts ¶ 61 & Ex. Z (Diab 1/21/10 Notes).)  On January 14, 2010, however, a world studies student, B.W., accused Diab of

_____

[3] For some reason, both parties state that D.A. was not transferred from Diab's class. (*See, e.g.,* Defs.' Resp. to Pl.'s Facts ¶ 62.)  But Szkapiak's undisputed testimony was that D.A. was in fact removed permanently from Diab's class after these incidents, and we proceed with that understanding.  (Szkapiak Dep. at 138–39.)

making derogatory comments about Mexican and Polish students. (Defs.' Facts ¶ 29; Szkapiak Dep. at 151–52.) Specifically, B.W. told Szkapiak that Diab told a student to "go back to Mexico."[4] (Szkapiak Dep. at 154; Pl.'s Facts, Ex. S (2/25/10 Hrg. Summary).) Szkapiak instructed B.W. to send him an email describing what she witnessed, which she did.[5] (Szkapiak Dep. at 152–55.) After consulting with the legal department, Szkapiak began his investigation by interviewing six or seven other students in that class.[6] (*Id.* at 155–60.) After the students corroborated B.W.'s account, Szkapiak issued Diab a pre-disciplinary hearing notice advising her of the complaint. (*Id.* at 160–61.) At the hearing, held February 25, 2010, Diab denied the allegations. (Pl.'s Facts, Ex. S (2/25/10 Hrg. Summary).) Nonetheless, Szkapiak credited the statements of the students he interviewed—one of whom Diab wanted to use as a character reference herself—and imposed a two-day suspension without pay. (*Id.* at 2.) Diab appealed Szkapiak's decision to the Board Office of Employee Relations but the suspension was upheld. (Defs.' Facts ¶ 30.) Diab testified that, during the hearing, Szkapiak commented that she intimidates students by telling them that she was educated at a Quaker school in the Middle

---

[4] Diab admits in her deposition that she did refer to the group of Polish students as the "little Polish pack" but contends that the comment was not derogatory. (Diab Dep. at 200–01, 205–06.) She also offered her own explanation of the comments made to the student who had been on an extended trip to Mexico. (*Id.* at 200–01.) Diab was not punished for the comment about the Polish students.

[5] Diab has presented the declaration of B.W.'s aunt, Sonja Blades, who stated that she does not believe B.W. wrote the email sent to Szkapiak. (Pl.'s Facts, Ex. I (Blades 6/6/11 Decl. ¶¶ 2, 4–5).) Blades reported that the formality and style of the email did not reflect B.W.'s writing ability. (*Id.*)

[6] Although Szkapiak testified that he kept notes on these interviews, he has never produced any such notes. (Defs.' Resp. to Pl.'s Facts ¶ 70.)

East—a comment she found demeaning.[7]  (Diab Dep. at 41.)  She also complained by letter to

the Department of Labor Employee Relations Director about the suspension and other alleged

discrimination, but she received no response.  (Defs.' Resp. to Pl.'s Facts ¶ 76.)  The student's

accusations and investigation upset Diab, who took a leave of absence at her doctor's orders.

(Diab Dep. at 221–25, 234.)  Diab then filed her first EEOC charge on April 22, 2010.  As

discussed in more detail below, Diab contends that other non-Arabic, non-Muslim teachers were

treated more favorably when accused of inappropriate comments in the classroom.  (*See* Pl.'s

Resp. to Defs.' Facts ¶ 31.)

*c.  2010 – 2011 School Year*

Diab returned to work, after her leave of absence and summer break, on September 1,

2010.  (Diab Dep. at 237–38.)  Diab continued to have problems with disruptive and

disrespectful students.  For example, a student directed a highly offensive comment at Diab in

Fall 2010.  (Diab Dep. at 244; Ruiz Dep. at 131–32; Defs.' Resp. to Pl.'s Facts ¶ 64.)  Diab

alleges that Pawelczyk instructed her not to use the PA system any more to call security when

her students got out of hand.  (Pl.'s Facts ¶ 81.)  Pawelczyk did not believe he made any such

statement.  (Pawelczyk Dep. at 89.)  Neither Ruiz, nor Szkapiak, had any personal knowledge

about Pawelczyk's alleged warning.  (Ruiz Dep. at 112; Szkapiak Dep. at 189.)

### ii.  Grading Practices

On December 3, 2010, Szkapiak questioned Diab about her grading practices.  Indeed,

the events of December 3, 2010 culminated in her resignation.  (Diab Dep. at 240.)

---

[7] Szkapiak denied making any such statement about Diab's education, nor did he recall any comment about the intimidation of students.  (Defs.' Resp. to Pl.'s Facts ¶ 76; Szkapiak Dep. at 162.)

December 3, 2010 was a staff development day. According to Szkapiak, it had been the practice at Kennedy for several years that teachers would forgo a lunch break on development days so that they could leave early to start the weekend. (Szkapiak Dep. at 191.) Szkapiak also testified that he clearly articulated this expectation to the teachers. (*Id.* at 195.) Khairallah testified that she didn't think there was a policy prohibiting teachers from leaving school on a development day, so long as they signed in and out. (Khairallah Dep. at 92–93.) On December 3, 2010, Szkapiak looked for Diab and repeatedly called for her on the PA system. (Khairallah Dep. at 92; Szkapiak Dep. at 190–92.) Szkapiak discovered that she had left the building to eat with another teacher, Marilyn Duhig. (Szkapiak Dep. at 191–92.) When they returned, Szkapiak spoke with them individually, reminded them of the staff agreement, and informed them that they would need to make up the hour they had taken as a break. (*Id.* at 192, 194–95.) Diab stayed to make up the lost time that afternoon, and Duhig, who could not stay late that day, made up the time the following Monday. (*Id.* at 194–95; *see also* Diab Dep. at 226–27.)     During his meeting with Diab, Szkapiak asked for her grades. Szkapiak testified that several students had complained late that semester that Diab's grading was not accurate. Specifically, they claimed that Diab would give students 100s even when they provided incorrect answers. (Szkapiak Dep. at 113–22, 193–94.) After receiving three notes from students with grading complaints, Szkapiak asked Pawelczyk, who oversaw the social studies department, to investigate. (*Id.* at 119–21.) Pawelczyk asked students for copies of their work to check for inconsistencies in Diab's grading—which he found and reported to Szkapiak. (*Id.* at 121–22.) During the December 3, 2010 meeting, Szkapiak asked Diab for samples of her student

coursework to see if there was any merit to the students' complaints.[8] (*Id.* at 193–94.) When Diab went to retrieve her folders from her classroom, she discovered that they were missing. (Diab Dep. at 227–31.) Someone had removed the folders from her desk. (*Id.*; *see also* Khairallah Dep. at 93–94.) Diab testified that every single student had earned and received 100s. (Diab Dep. at 230–31.) She felt that Szkapiak's questioning was somewhat "ironic" because her grading had never been questioned before and because her folders suddenly disappeared. (*Id.* at 230–33.) Although she told Szkapiak that she would bring the folders to him on Monday, she never returned to Kennedy. (*Id.* at 229; Szkapiak Dep. at 193.)

Diab became distraught in light of these events and attempted to take another medical leave, but her leave request was denied. (Pl. Resp. to Defs.' Facts ¶ 42.) Accordingly, she resigned on December 20, 2010. (*Id.*)

### B. Diab's Interactions at Kennedy

In addition to the above, Diab's claims are based on several allegedly discriminatory interactions with fellow staff members at Kennedy. We thus recount the relevant facts about such instances, generally in chronological order.

Shortly after her arrival at Kennedy in 2002, another teacher—Paul Hease—put a Bible in Diab's office mailbox and told her that she should learn about Christianity. (Diab Dep. at 36–40.) The two then discussed this issue, and Hease apologized about six months later. (*Id.*) Several years later, in 2010, Hease commented in the staff lounge that Muslims were insane and terrorists. (*Id.* at 37–38.) Diab called Hease out on this comment but did not report the incident

---

[8] The parties seem to dispute whether Szkapiak asked for student work from particular classes, but that dispute is immaterial. (*Compare* Diab Dep. at 227–29 *with* Szkapiak Dep. at 193–94.)

to Szkapiak or the assistant principals.  (*Id.* at 38–39.)

On January 12, 2009, Diab received something else unwelcome in her office mailbox: a note reading "Israel is doing OK."  (Defs.' Facts ¶ 16.)  Diab felt threatened and cried upon finding the note, which she stated followed the killing of 9,000 people in Gaza refugee camps by the Israelis.  (Pl.'s Facts ¶ 48.)  Diab reported the incident to Szkapiak, who indicated (and later confirmed) that the security cameras would not have captured the act.  (*Id.*; Szkapiak Dep. at 77.)  Diab testified that Szkapiak also commented that the note was "only words," but Szkapiak did not recall making such a statement.  (Defs.' Resp. to Pl.'s Facts ¶ 48; Szkapiak Dep. at 70.)  After speaking with Diab, Szkapiak immediately contacted the legal department for guidance.  (Szkapiak Dep. at 70, 78–79.)  He filled out an incident report, which was filed and sent directly to the Labor and Employee Relations Office, as well as the Office of Safety and Security.  (*Id.* at 72–80.)  Szkapiak was not aware of any investigation undertaken by those departments.  (*Id.* at 76–77.)

Diab expected Szkapiak to address this matter with the staff, as early as a meeting that same afternoon.  (Defs.' Facts ¶ 19; *see* Diab Dep. at 143–44, 49, 160; Khairallah Dep. at 53.)  He did not, however.  Diab and her colleague, Khairallah, were concerned that Szkapiak had not taken public action to rectify the situation and asked him do so, about a week after the incident.  (Diab Dep. at 163–64; Khairallah Dep. at 50–52.)  Szkapiak asked what they wanted him to do, and they instructed him to issue a memo.  (Diab Dep. at 164; Khairallah Dep. at 51–52.)  Diab and Khairallah then helped Szkapiak prepare a memo.  (Diab Dep. at 164; Khairallah Dep. at 51–52.)  Although that memo admonished the staff to practice cultural sensitivity, particularly in regard to the usage of mailboxes, Diab and Khairallah felt that Szkapiak's response was

insufficient because: (1) he did not specifically mention intolerance against Arab-Americans; and (2) he did not orally address the issue with the staff.  (Diab Dep. at 171; Khairallah Dep. at 51–52.)  After speaking with a doctor, Diab took two days off of work due to posttraumatic stress disorder.  (Diab Dep. at 164–66.)

About this time, Diab met with Pawelczyk about the offensive note and her security. (Pl.'s Facts ¶ 51.)  Pawelczyk made a comment about the type of car she drives during that meeting, though the parties seem to disagree about his exact words.  (Diab Dep. at 173; Pawelczyk Dep. at 44–45.)  Regardless, it is undisputed that Diab reported that her car was vandalized in the school parking lot days later, on January 28, 2009.  (Defs.' Facts ¶ 20.)  At Szkapiak's request, Pawelczyk submitted an incident report to the Board of Education about the damage to Diab's car.  (Pawelczyk Dep. at 48–49.)  Pawelczyk did not know about any other investigation or action on behalf of Defendants concerning the vandalism.  (*Id.*)

The head of the bilingual department, Jadwiga Pytlik, asked Diab several times during 2009 when she planned to retire.  (Defs.' Facts ¶ 5.)  Pytlik was concerned that she (Pytlik) might lose her job or be forced to retire.  (*Id.*)  Diab, while disconcerted by these comments, did not report them to her supervisors.  (*Id.*)

Diab complained to Szkapiak that she felt isolated because she could not attend social studies department meetings due to her class schedule.[9]  (Diab Dep. at 82–90.)  She also was not notified of all curriculum development meetings.  (*Id.* at 87–90.)  Diab additionally felt ostracized because she lacked access to department resources and collaboration with her fellow

---

[9] Diab clarified that her teaching schedule changed because she voluntarily agreed to switch class periods with Ms. Khairallah.  (Pl.'s Resp.  Defs.' Facts ¶ 6.)

teachers.  (*Id.* at 90–96.)  Diab testified, for example, that she was deprived of a handbook, overheads, curriculum notes, and other materials.  (*Id.* at 91–92, 94–97.)  She also testified that she did not always receive notice of outside conferences and seminars of interest to teachers. (*Id.* at 98–99.)  Diab acknowledged that she has no idea who denied her access to such meetings, items, and information, or why they might have done so.  (*Id.* at 84, 86, 88, 89, 92, 95–96, 100–101.)

Diab had particular difficulties with a younger teacher in the department, Ms. Alting, who refused to collaborate with Diab.  (*Id.* at 97.)  Diab had been assigned to mentor Alting and, according to Khairallah, Diab attempted to be helpful and kind to Alting.  (Pl.'s Resp. Defs.' Facts ¶ 11; *see* Khairallah Dep. at 74–75.)  Nonetheless, Alting eventually refused further mentoring with Diab, demeaned her requests for resources, and told her to "shut up" in a particular department meeting at some point during the 2008-2009 academic year.  (Khairallah Dep. at 72–76; Diab Dep. at 52–57.)  Diab informed Pawelczyk of Alting's alleged behavior and that she perceived it as discriminatory.  (Diab Dep. at 55.)  Although Pawelczyk interviewed Alting, he did not take notes, follow up with Diab, or contact the equal employment compliance office manager.  (Pawelczyk Dep. at 58–64.)  Diab testified that, while she felt Alting's attitude was discriminatory, she could not recall any negative, biased comments made by Alting and could not rule out the possibility that Alting just did not like her personality.  (Diab Dep. at 55–57.)

In September 2010, after taking her leave of absence and initiating this litigation, Diab returned to Kennedy and was assigned to teach social studies in the bilingual department for that school year.  (Pl.'s Facts ¶ 80.)  Diab testified that she felt more isolated than before from the

social studies teachers, though she could not identify exactly why.  (Diab Dep. at 269.)

Presumably she felt isolated because, having been reassigned, she was no longer attending social

studies department meetings.  (Diab Dep. at 269–70.)  Although Diab is certified to teach

bilingual classes, she felt that she had been pushed out of the social studies department because

of her age.  (*Id.* at 270–72.)

During her time at Kennedy, Diab was involved with two student organizations, Cultural

Connections and the Arab-American Students Club, which held an annual day-long fair.  (Defs.'

Facts ¶ 8; Szkapiak Dep. at 20–21.)  Szkapiak did not remove Diab from or limit her

participation in those clubs.  (Defs.' Facts ¶ 8.)  Beginning in the 2010-2011 school year,

however, he cancelled all cultural fair events that lasted the entire day, which included, among

others, the Arab-American Students' fair.  (Szkapiak Dep. at 21–28; T. Kelly Dep. at 13–17.)

Although a pep rally and certain yoga activities were permitted, Szkapiak did not allow all-day

cultural events because he wanted to retain instructional time.  (Szkapiak Dep. at 23–26, 28, 34.)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  A genuine

issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505,

2510 (1986).  This standard places the initial burden on the moving party to identify those

portions of the record that "it believes demonstrate the absence of a genuine issue of material

fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal

quotations omitted).  Once the moving party meets this burden of production, the nonmoving

party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56(c). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255. Finally, "[w]e apply the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on the issues of intent and credibility." *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000) (citing *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491 (7th Cir. 2000)).

## ANALYSIS

### I.    DISCRIMINATION

We turn first to Diab's claims that Defendants discriminated against her based on her age, national origin, race and religion, in violation of Title VII, the Age Discrimination in Employment Act ("ADEA") and 42 U.S.C. §§ 1981 and 1983. To prevail on these claims, Diab must show that Defendants subjected her to an adverse employment action. Such actions generally take three forms: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, — F.3d —, 2011 WL 4921603, at *4 (7th Cir. Oct. 18, 2011); *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744–45 (7th Cir. 2002). We address Diab's specific allegations below, beginning with her hostile work environment claims.

### A.    Hostile Work Environment

To survive summary judgment on her hostile work environment claims, Diab must show "that a rational trier of fact could find that [her] workplace [was] permeated with discriminatory conduct—intimidation, ridicule, insult—that [was] sufficiently severe or pervasive to alter the conditions of [her] employment." *Silk v. City of Chi.*, 194 F.3d 788, 804 (7th Cir. 1999); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S. Ct. 2275, 2283 (1998); *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007). She must set forth evidence sufficient to infer that: "(1) she was subject to unwelcome . . . harassment; (2) the harassment was based on her [protected characteristics]; (3) the . . . harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability." *McPherson v. City of Waukegan*, 379 F.3d 430, 437–38 (7th Cir. 2004); *Atanus v. Perry*, 520 F.3d 662, 676 (7th Cir. 2008); *Cerros v. Steel Techs.*, Inc., 288 F.3d 1040, 1045 (7th Cir. 2002). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993); *see Hilt-Dyson v. City of Chi.,* 282 F.3d 456, 462–63 (7th Cir. 2002) (observing that conduct must be so severe as to alter the conditions of employment). In evaluating a hostile work environment claim, a court must consider the "totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Cerros*, 288 F.3d at 1046 (quoting *Harris*, 510 U.S. at 23, 114 S. Ct. at 371); *Atanus*, 520 F.3d at 676 (noting that this analysis is not

-16-

mathematically precise but requires consideration of all the circumstances).

1.    *Age*

In support of her hostile work environment claim based on age, Diab points to the conduct of fellow staff members, Pytlik and Alting. (*See* Resp. at 6.) It is undisputed that Pytlik asked Diab three or four times in 2009 when Diab planned to retire. (Diab Dep. at 103–07.) Pytlik was apparently concerned that she might lose her own job or be forced to retire. (*Id.*) Based on Diab's testimony, Pytlik's intermittent questioning did not intimidate, deeply offend, or otherwise affect Diab. (*Id.*)

Diab was plainly troubled by Alting's behavior, however. As described earlier, Alting—substantially younger than Diab—refused to collaborate with Diab, rejected Diab's mentoring, demeaned Diab's requests for resources, and told her to "shut up" in a departmental meeting during the 2008-2009 school year. Diab perceived this unprofessional conduct to be discriminatory and complained to Pawelcyzk about Alting's negative attitude.[10]

Diab also alleges that younger teachers were allowed to come and go as they pleased, whereas she was reprimanded for leaving school grounds on a staff development day with a co-worker. (Diab Dep. at 255–61.) She did not know, however, whether Szkapiak ever addressed the younger teachers on this point. (*Id.*; Defs.' Facts ¶ 39.)

Taking these facts into account—even within the context with Diab's general allegations about feeling isolated in the department—this conduct hardly constitutes the type of behavior that could have objectively altered the conditions of her employment. Moreover, Diab presents

_____

[10] Diab's deposition testimony suggests a suspicion that Alting's attitude was based on Diab's religion, race and/or national origin, rather than her age. (Diab Dep. at 53–56.)

no evidence from which a jury could infer that either Alting's rudeness or the younger teachers' alleged ability to come and go without question stemmed from an age-related bias. Pytlik's periodic comments, while perhaps annoying, were not frequent, patently offensive or otherwise disruptive. Because no reasonable jury could infer that these circumstances created a hostile work environment based on age, this claim must fail.

### 2. Race, National Origin and Religion

Diab's remaining hostile work environment claims have but a little more weight. Diab identifies several incidents occurring between January 2009 and January 2010, which she alleges resulted in a hostile work environment necessitating her medical leave in the spring of 2010. (Resp. at 5–8.)

On January 12, 2009, Diab received the "Israel is doing OK" note in her mailbox, which she deemed hate mail. Diab felt personally threatened by the note, which she stated followed the killing of 9,000 people in Gaza by the Israelis. Although Szkapiak investigated and reported the incident to the Labor and Employee Relations department, no further inquiries were made by that department and the offender was never identified. Szkapiak, with assistance from Diab and Khairallah, also prepared a memo to the staff, which Diab felt was not adequate to ameliorate the situation. It is undisputed that Diab required two days off of work due to the strain induced by the offensive note. (*See* Resp. at 5.)

A couple of weeks later, Diab's car was vandalized in the school parking lot. Pawelcyzk submitted an incident report to the Board, but there is no evidence that any investigation followed. (*Id.*)

Two months later, on March 24, 2009, Szkapiak arrived at Diab's classroom to assist her

after the class had become extremely unruly. Rather than correct the students, as Diab had anticipated, Szkapiak stepped in to teach the remainder of the class while she watched from the back. He assigned homework and personally collected it the following day. Szkapiak did not recall ever taking such actions before. According to Diab, who we credit at this juncture, Szkapiak then returned to observe her class four times a week for three months. Szkapiak acknowledged that he sat in on Diab's teaching more often than he did with any other teacher at Kennedy. Diab, as well as others, felt that Szkapiak's response undermined her authority. (*Id.* at 6.)

The beginning of the next school year brought Diab's class management issues with her 8th period world studies class, particularly when D.A. was present. Diab argues that the administration's failure to facilitate a meeting with D.A.'s guardian exacerbated the problems. She contends that this failing emboldened her students to desecrate her Quran weeks later. She also complains that Pawelcyzk did not speak to her class about this act of vandalism despite her request that he do so. (*Id.* at 7.)

Szkapiak observed Diab's class again on November 2, 2009. Diab led the class in a Jeopardy-style review session that day. A student was asked to identify Jesus Christ's religion and responded that Jesus was born into Judaism, as indicated in the textbook. Diab corrected the student, noting that this view is disputed. Szkapiak later spoke with Diab about this exercise and relayed his concern that Diab didn't credit the student for providing the textbook answer. Diab contends that Szkapiak's critique evidences his discriminatory bias against her.[11] (*Id.*)

---

[11] Diab also identifies her suspension in January 2010 as further evidence of Szkapiak's illegal motivation. The parties do not dispute (at least for purposes of this motion) that Diab's suspension constituted a tangible, material adverse employment action. (Mem. at 7.) The

Finally, Diab encourages us to take into account the views of two other Arab Muslim teachers at Kennedy, who also felt that Szkapiak discriminated against them. (*Id.* at 8.) Ms. Hammad, for example, applied for an open English position at Kennedy twice but was passed over, for reasons she did not find convincing. (Hammad Dep. at 8–26.) Hammad testified that she wasn't sure whether Szkapiak was discriminating against her based on her protected characteristics, but she could not help take his decisions personally. (*Id.* at 17.) In addition, Khairallah felt that Szkapiak harassed her about tardiness and absences, although she witnessed other teachers miss portions of meetings and arrive significantly late. (Khairallah Dep. at 45–49.) Khairallah acknowledged in her testimony that she did not know whether Szkapiak addressed these issues with the other teachers. Diab also points out that others at Kennedy noticed that she was being targeted.

Even taking all of these incidents into account, we cannot conclude that a rational trier of fact could infer an objectively hostile environment based on Diab's race, religion or national origin.[12] There is no question that Diab subjectively perceived the environment at Kennedy to be highly toxic; indeed, she required a medical leave to address the negative psychological impact of these events on her. The essential problem with Diab's claims is that most of the above-recited incidents bear no mark of discriminatory motivation.[13]

---

suspension issue is thus more appropriately addressed in our later analysis of Diab's discrimination claim under the direct and indirect method. *See Herrnreiter*, 315 F.3d at 744–45 (distinguishing the different types of claims that exist under Title VII).

[12] Diab also alleges a few offensive comments made by another teacher or students over the years. These stray comments do not factor into our analysis or conclusion.

[13] To the extent that Diab alleges that Alting's conduct also added to the hostile work environment based on religion, race or national origin, such claims fail for this same reason. That is, Diab may suspect that Alting's behavior stemmed from anti-Arab or anti-Muslim

For example, Szkapiak's critique of Diab's November 2, 2009 Jeopardy-style review session does not permit any inference of discriminatory purpose. Although the question posed to the student—and thus the most general background circumstances—concerned a religious figure and his upbringing in the Middle East, Szkapiak's comments to Diab about her response and the overall effectiveness of the class were entirely neutral. Szkapiak did not dispute Diab's contention that different sources present varying accounts of Jesus' ethnicity or religion. (Szkapiak Dep. at 111–12.) Rather, Szkapiak criticized Diab for not accepting as correct answers taught in the classroom materials for that lesson. (*Id.* at 108–09, 111–12.) He explained to Diab that her response created confusion and commotion and that she should have focused on a single correct answer for purposes of the review session. (*Id.*) This critique, which is not itself overtly discriminatory, could have been delivered in precisely the same manner without regard to the underlying question that gave rise to it. In short, this incident does not support Diab's hostile work environment claims. *See Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 724, 732 (7th Cir. 2009) (rejecting plaintiff's argument that principal's criticism was racially-motivated where he criticized her teaching, based on a interviewing skills lesson where she told a lengthy story about racial profiling by police).

In addition, Szkapiak's decision to take over Diab's March 24, 2009 class and then regularly observe her teaching multiple times a week does not reveal any underlying, unlawful prejudice. Although Szkapiak admitted that he had taken neither step before with other teachers at Kennedy, we cannot infer that he did so with respect to Diab because she falls within any protected class. Such an inference would be particularly inappropriate in light of the testimony

---

discrimination, but there is no evidence to back up that speculation. (*See* Diab Dep. at 54–57.)

from multiple witnesses that Diab had increasing problems managing that class during the 2008-2009 school year.  As the Seventh Circuit has stated, "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a" protected class.  *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005).  Even deeming Szkapiak's conduct as severe or pervasive harassment, Diab presents no evidence from which a jury might infer harassment based on her religion, race or national origin.

The same holds true for Diab's allegations about the vandalism to her car in January 2009, the administration's response to her difficulties with D.A., and Szkapiak's handling of the investigation that led to her suspension.  This conduct is neither inherently discriminatory on its face, nor tinged with discriminatory overtones.  *Beamon*, 411 F.3d at 863; *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 346 (7th Cir. 1999).  Very little is known about the damage to Diab's car; the record includes no evidence about who did it, when, how or—most importantly—why.  And although it occurred a few weeks after the anonymous "Israel is doing OK" note, a factfinder could not fairly infer that the two incidents are related without additional information.  *See, e.g.*, *Hobbs v. City of Chi.*, 573 F.3d 454, 464 (7th Cir. 2009) (allegation concerning vandalism to car and lack of investigation, which happened after plaintiff's EEOC charge was filed and the same day she received notice of a disciplinary action, was not enough to forestall summary judgment on retaliation claim).

There are also no facts from which a jury might infer a discriminatory motive as to the administration's response to D.A.'s disturbing conduct.  Diab presented no evidence that other teachers, who also had problems with D.A., received any different or more useful intervention.

According to Diab's notes, Pawelcyzk encouraged her to fill out reports on each incident and told her that she must be willing to testify at expulsion proceedings for D.A. (Pl.'s Facts, Ex. P (9/30/09 Diab Notes) at 2.) D.A. was permanently removed from her class after these three incidents, all of which occurred in about a week. Although Szkapiak and Pawelcyzk did not facilitate a meeting between Diab and D.A.'s guardian—which Diab apparently did not ask of them at the time but believes would have been appropriate—we cannot say that their response belies any improper motive.[14] In addition, Hammad's and Khairallah's speculation about their own disagreements with Szkapiak does not allow the inference that his decisions with respect to Diab may have been tainted by unlawful bias. Ultimately, the record demonstrates that much of the "harassment of which [Diab] complains could just as readily been perpetrated upon a [non-Muslim, non-Arab, non-Palestinian] person without any alteration in its character or purpose." *Beamon*, 411 F.3d at 863.

There are two incidents, however, that clearly evince bigotry: the desecration of Diab's Quran and the "Israel is doing OK" note. There can be no question that the destruction of the Quran in October 2009 was an attack based on Diab's religion and was both objectively and subjectively offensive. The students' conduct was truly reprehensible. "No teacher should be subject to the deplorable behavior described in the facts of this case." *Lucero*, 566 F.3d at 732 (recounting students' conduct in showing a picture of a classmate's naked buttocks in class and placing pornographic magazines in plaintiff's classroom). Yet while condemnable, this incident

---

[14] The record indicates that Diab tried unsuccessfully to contact D.A.'s guardian herself, presumably during the course of the week when these incidents happened. (Pl.'s Facts, Ex. P (9/30/09 Diab Notes) at 2.)

was isolated and not physically threatening.[15]  In addition, the record does not indicate that this event unreasonably interfered with Diab's work performance.

The "Israel is doing OK" note, on the other hand, plainly affected Diab's work performance, requiring her to take time off work.  Based on the content and timing of the note in light of events in Gaza, a reasonable factfinder could infer that the unidentified author targeted Diab because of her race, religion and/or national origin.  We also agree with Diab that a reasonable person could find this note objectively upsetting.

Nonetheless, we cannot conclude that a reasonable jury could find that the note—taken together with the Quran incident nine months later—created a hostile work environment.  The two incidents, while disconcerting, were not repeated.  They did not involve any physical contact or verbal abuse.  Despite Diab's testimony that she subjectively felt threatened by the note, neither of these incidents included direct or implied threats to her personal safety or her job.  There is no evidence to suggest that these offenses were committed or condoned by Diab's supervisors or other administrators at Kennedy.  Diab decries the sufficiency of their responses, but it is undisputed that Pawelczyk and Szkapiak took action (as described earlier) after learning of these incidents.  Diab is correct that a single incident can support a hostile work environment claim, if sufficiently severe or pervasive.  While we do not mean to trivialize the difficulties Diab faced at Kennedy, the incidents described here are neither severe, nor pervasive enough to

_____

[15] Diab's complaint that Pawelczyk did not directly address her students—but merely stood by while she handled the situation—does not much affect our analysis.  While insufficient in Diab's eyes, Pawelczyk's failure to speak to her class at her request is not pervasive or severe (even if considered harassment) such that it could bolster her hostile work environment claims.  Moreover, we cannot infer on the record before us that Pawelczyk decided not to speak to the class *because of* Diab's race, religion or national origin.

constitute an adverse employment action within Title VII's protection. We therefore grant

Defendants' motion as to Diab's hostile work environment claims.

### B.    Disparate Treatment

We turn then to Diab's disparate treatment claim, which focuses on the suspension

imposed in January 2010.[16] Diab pursues this claim under both the indirect and direct methods

of proof, which we discuss below.

### I.    *Indirect Method*

Under the indirect method, articulated first in *McDonnell Douglas Corporation v. Green*,

411 U.S. 792, 93 S.Ct. 1817 (1973), Diab must establish a prima facie case of discrimination.

The prima facie case requires proof that: (1) Diab is a member of a protected class; (2) her job

performance met her employer's legitimate expectations; (3) she suffered an adverse

employment action; and (4) at least one similarly-situated employee not in her protected class

was treated more favorably. *See Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596,

599–600 (7th Cir. 2010); *Martino v. MCI Comm'cn Servs., Inc.*, 574 F.3d 447, 453 (7th Cir.

2009); *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009); *Wyninger v. New Venture

Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004). If the elements are established, discrimination is

inferred and the burden of production shifts to Defendants to raise a legitimate,

nondiscriminatory reason for the adverse action. *Naik*, 627 F.3d at 600; *Antonetti*, 563 F.3d at

591. Once a legitimate reason is offered, the inference of discrimination disappears, and Diab

must establish that the offered reason is a pretext for unlawful discrimination. *Naik*, 627 F.3d at

---

[16] Diab contends that her alleged constructive discharge in December 2010 resulted from the retaliation she faced after returning for the 2010-2011 school year. (*Compare* Resp. at 11–16 *with* Resp. at 17–19.) We will likewise address that claim later in the retaliation context.

600; *Antonetti*, 563 F.3d at 591.  Here, there is no question that Diab satisfies the first and third prong of the indirect method.  (Mem. at 7.)

Nonetheless, Diab's claim under the indirect method fails because she cannot show that she was meeting her employer's legitimate expectations.  As detailed earlier, Szkapiak identified numerous problems with Diab's teaching effectiveness and classroom management.  (Section II.A.i., *supra* at 2–8.)  Although neither party has pointed to an annual performance evaluation of Diab prepared by Szkapiak, the record clearly establishes that he felt her performance was substandard.  In addition, both Assistant Principals identified weaknesses with Diab's teaching.[17] Ruiz and Pawelczyk testified that Diab was not a strong teacher and considered her performance unsatisfactory.  (*Id.* at 3–4; *see* Pawelczyk Dep. at 33–36; Ruiz Dep. at 167.)  Moreover, Ruiz ranked Diab in the bottom 10% of all teachers at Kennedy.  (Ruiz Dep. at 67–68.)

Despite these negative reviews, Diab contends that she has created an issue of fact about her performance.  Diab argues that her excellent record prior to Szkapiak's arrival shows that he subjected her to an "extremely high standard."[18]  (Resp. at 13.)  This argument overlooks the fact that Szkapiak was not the only administrator to poorly regard Diab's performance.  It also discounts the possibility that Szkapiak held all of his teachers to a high standard.  (Diab does not argue, for example, that Szkapiak held *only* Diab to a higher standard.)  More importantly, this argument flies in the face of established precedent that we evaluate Diab's job performance "at

---

[17] We assume, apparently like the parties, that Ruiz and Pawelczyk are Diab's supervisors to some extent, in addition to Szkapiak.

[18] Of course, Diab's "own evaluation of [her] work cannot be imputed to [Defendants], and is insufficient to permit [her] case to survive past summary judgment."  *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 603 (7th Cir. 2011); *see, e.g., Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 738–39 (7th Cir. 2011).

the time of the adverse employment action." *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir.

2009); *Burks v. Wis. Dep't Transp.*, 464 F.3d 744, 752 (7th Cir. 2006); *see Dass v. Chi. Public

Schs.*, No. 08 C 6045, 2010 WL 4684034, at *11 (N.D. Ill. Nov. 12, 2010) (holding that evidence

that plaintiff taught effectively in prior years was irrelevant); *Truesdale v. Maine Township High

Sch. Dist. # 207*, No. 04 C 7132, 2006 WL 2375469, at *9 (N.D. Ill. Aug. 14, 2006) (fact that

plaintiff met expectations in prior years did not create a question of fact because both the quality

of work and evaluators could have change).

Diab also points to the testimony of colleagues who praised her teaching, in her effort to

raise a triable question about this performance element.  (Resp. at 13.)  It is undisputed that Jason

Kelly, Tim Kelly and Khetam Khairallah testified that Diab was a good teacher, who kept her

students on task.  (Section II.A.i., *supra* at 4.)  These vague endorsements, however, refute

neither the opinions of Szkapiak, Ruiz and Pawelczyk, nor the facts (ie. classroom observations)

that gave rise to them.  As the Seventh Circuit has repeatedly stated, "'general statements of co-

workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a

material issue of fact.'"  *Burks*, 464 F.3d at 752 (quoting *Peele v. Country Mut. Ins. Co.*, 288

F.3d 319, 329 (7th Cir. 2002)); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir.

2004) (noting that coworkers' opinions that the plaintiff did a good job were close to irrelevant

(internal quotation omitted)).  In light of the above, Diab cannot avail herself of the indirect

method.

### ii.    *Direct Method*

Under the direct method, a plaintiff may show through either direct or circumstantial

evidence that "the employer's decision to take the adverse job action was motivated by an

impermissible purpose, such as her race or national origin." *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 529 (7th Cir. 2003); *see Phelan v. Cook Cty.*, 463 F.3d 773, 779–80 (7th Cir. 2006). Direct evidence of discrimination is evidence that would show a clear acknowledgment of discriminatory intent by the employer. *See, e.g., Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (explaining that direct evidence is an "outright admission by the decisionmaker that the challenged action was undertaken because of the [employee's] race"). "Direct proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion," however, and may include "circumstantial evidence which suggests discrimination albeit through a longer chain of inferences." *Luks v. Baxter Healthcare Corp.*, 67 F.3d 1049, 1052 (7th Cir. 2006); *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2009).

Thus, Diab may succeed under the direct method by presenting circumstantial evidence that sets out a "convincing mosaic of discrimination," *Troupe v. May Department Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994), from which a jury may reasonably infer intentional discrimination. *Luks*, 67 F.3d at 1053 (observing that even if evidence is not a "convincingly rich mosaic . . . it is enough that the circumstances give rise to a reasonable and straightforward inference" of discrimination); *see also Silverman*, 637 F.3d at 733–34; *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903–04 (7th Cir. 2006); *Volovsek v. Wis. Dep't of Agric., Trade & Cons. Prot.*, 344 F.3d 680, 689 (7th Cir. 2003). In *Volovsek*, the Seventh Circuit reiterated that such circumstantial evidence typically includes:

> (1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently; or (3) evidence that the employee was [adequately performing] the [job in question] and [yet disciplined] and the employer's reason for the

difference in treatment is a pretext for discrimination.

*Id.* at 689–90 (citing *Troupe*, 20 F.3d at 736).  These three forms of circumstantial evidence can be used independently or in the aggregate to "provide a basis for drawing an inference of intentional discrimination."  *Troupe*, 20 F.3d at 736; *Coleman v. Donahoe*, —F.3d—, 2012 WL 32062, at *19 (7th Cir. Jan. 6, 2012); *see Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 632 (7th Cir. 2009) (noting that the mosaic need not be "rich and varied" so long as "what evidence there is adds up to discriminatory intent").

Here, Diab contends that the suspension imposed in January 2010, and Szkapiak's related investigation into her classroom comments, constitute intentional discrimination based on her race, religion and national origin.  (Resp. at 12.)  Diab asserts that Szkapiak pursued his investigation, without first interviewing her, based on student accusations he knew to be false. (*Id.* at 15.)  She also claims that she received harsher punishment than similarly-situated co-workers outside her protected classes, who committed similar (or worse) offenses.  (*Id.* at 13–14.)  Finally, Diab alleges that Szkapiak made a demeaning comment in her pre-disciplinary hearing that reveals his discriminatory motive.  (*Id.* at 15.)

Despite Diab's insistence, there is no evidence to suggest that Szkapiak knowingly disciplined her based on false accusations.[19]  Diab mischaracterizes Szkapiak's testimony in her effort to raise a question of fact on this point.  (*Id.* at 15.)  First, contrary to Diab's claim, Szkapiak did not testify that two students complained to him about the comment that led to the suspension.  He testified that one of Diab's students, who heard the disputed comment, came to

_____

[19] Diab does not deny that she made a comment to the student about travel to Mexico.  To the contrary, she contends that the students simply misheard or misunderstood her comment.

-29-

him to complain *accompanied by* one of her friends. He never stated that both students witnessed the incident. (Szkapiak Dep. at 151–54.) Second, Szkapiak did not provide conflicting testimony about his knowledge of Diab's efforts to fight discrimination. He acknowledged that she had done work in the area of tolerance and also testified that he did not recall specifically whether she taught tolerance classes. (Szkapiak Dep. at 198.) As Defendants point out, this testimony is neither inconsistent, nor sufficient to create an aura of discriminatory motive.[20]

    In addition, we do not find troubling the fact that Szkapiak elected not to interview Diab before proceeding with his investigation. While he had done so informally with a prior incident, Diab does not contend that Szkapiak was required to speak with her prior to noticing the pre-disciplinary meeting, or that he typically did so with others. (*See* Resp. at 15; *see also* Defs.' Facts ¶ 30.) Diab hints at the argument, but this is not a case where an employer's departure from its own internal policies or procedures allows an inference of discrimination. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005) (finding that defendant's failure to follow its internal hiring procedures "point[e]d to a discriminatory motivation"); *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 733 (7th Cir. 2005) (finding relevant plaintiff's "evidence that the school board had failed to follow it own procedures in demoting her").

    Nonetheless, Diab has come forward with circumstantial evidence sufficient to raise a triable question of fact about Szkapiak's decision to suspend her without pay for two days. Diab

---

    [20] In addition, Sonja Blades' affidavit does not call Szkapiak's investigation into question. Although it implies that B.W. did not independently write the email Szkapiak received, it does not support the much broader inferences Diab would like us to draw, i.e. that Szkapiak drafted the email and/or coached student witnesses for a nefarious purpose.

identifies three colleagues—non-Arab, non-Muslim, non-Palestinian, and substantially younger[21]—who were treated more favorably than she when facing very similar allegations of misconduct.  (Resp. at 14.)  In 2008, Szkapiak issued a one-day suspension without pay to a Hispanic teacher, Ms. Ortiz, who said to a student: "Normally Polish kids value their education, what happened to you?," or something to that effect.  (Pl.'s Facts ¶ 72.)  The record shows that Szkapiak and Ruiz were concerned that Ortiz had made similar comments and, moreover, that Ortiz was insubordinate to Ruiz during the course of the pre-disciplinary hearing.  (*See* Pl.'s Exs. HH–JJ.)  During the 2009-2010 school year, another teacher, Mr. Hease, told a Latino student—who had just fallen off his chair—that he better "lay off the quesadillas" because he was "getting too big."  (Pl.'s Facts ¶ 73; *see* Szkapiak Dep. at 172–74.)  Szkapiak held a pre-disciplinary hearing but then took no action against Hease, who is white, English, and a Christian.  (Pl.'s Facts ¶ 73; *see* Szkapiak Dep. at 172–74.)  Szkapiak also declined to discipline Ms. Alting, who admitted to pouring water on a student's head to get his attention.  (Pl.'s Facts ¶ 73; *see* Szkapiak Dep. at 172–74.)  The parties do not dispute that Alting is white, American-born and non-Muslim.  Thus, Diab has shown that Szkapiak imposed more severe discipline in her case than in situations involving similarly-situated teachers without her protected characteristics.[22]

---

[21] It is undisputed that two of these comparators, Ms. Alting and Mr. Hease, are substantially younger (approximately 18 years) than Diab.  Ms. Ortiz, however, is the same age as Diab.  (*See, e.g.*, Pl.'s Ex. FF.)

[22] Defendants state, in their response to Diab's statement of facts, that the parents involved in the Hease and Alting incidents requested that Szkapiak not punish the teachers.  Defendants also explain that Szkapiak was lenient with Ortiz because it was his first year as principal.  Defendants claim that these situations differ from Diab's because these three teachers admitted their guilt, while Diab proclaimed her innocence.  (Defs.' Resp. to Pl.'s Facts ¶ 73.)

In addition to this circumstantial evidence of disparate treatment, Diab raises a question about Szkapiak's motive. Diab testified that, during the pre-disciplinary hearing, Szkapiak (the decisionmaker) said that she intimidates students when telling them that she was educated at a Quaker school in the Middle East. Diab testified that she found this comment "demeaning" to her culture and her experience attending school overseas. (Diab Dep. at 41.) Although Defendants do not address this testimony in their briefs, Szkapiak did not recall making any such comment. (Defs.' Resp. to Pl.'s Facts ¶ 76; Szkapiak Dep. at 162.) This comment, which appears out of context in the record, is fairly ambiguous. (Diab Dep. at 41.) It is not clear why Szkapiak would have made this comment (assuming he did, as we must), or exactly what he might have meant. Nor can we evaluate the tone of the statement; as Diab found it demeaning, however, we will assume for the time being that it was intended to be offensive. At the very least, the comment demonstrates that Diab's background and upbringing in the Middle East were on Szkapiak's mind during the pre-disciplinary hearing. Drawing all inferences in Diab's favor at this juncture, Szkapiak's comment and uneven discipline permit the inference that discrimination against Diab's age, race, national origin and/or religion may have played a part in his decision to suspend her without pay for two days, in lieu of some lesser or no discipline. Defendants' motion is thus denied as to Diab's suspension claim based on the direct method.

## II. RETALIATION

We next turn to consider Diab's claims of retaliation, brought under Title VII and § 1981. Diab alleges that she suffered additional and exacerbated discrimination after filing her first

---

Regardless, Defendants do not even mention these comparators in their briefs or attempt to argue that they are not similarly-situated to Diab for the stated reasons. We decline to undertake that chore for them.

EEOC charge on April 22, 2010 and her lawsuit on August 3, 2010. Like discrimination, retaliation may be proved through either the direct or indirect method. *Burks*, 464 F.3d at 758; *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). As discussed above, Diab cannot satisfy the elements of the indirect method, and we shall thus evaluate her claims under the direct approach.

To proceed to trial on her retaliation claim, Diab must come forth with evidence: "(1) that she engaged in protected conduct, (2) that she suffered an adverse employment action, and (3) that there is a causal connection between the two." *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011); *Burks*, 464 F.3d at 758. The parties do not dispute that Diab engaged in protected conduct. We shall thus focus on the second and third prongs.

### A.      Materially Adverse Actions

The standard for what may constitute an adverse employment action is more flexible in the context of a retaliation claim than in the context of a substantive discrimination claim. *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2414 (2006); *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 660 (7th Cir. 2005). In the context of a retaliation claim, adverse employment actions are not limited to actions that affect the terms and conditions of employment. *Burlington*, 548 U.S. at 63, 126 S. Ct. at 2413; *Washington*, 420 F.3d at 660 (noting that retaliation may take many forms). Instead, we evaluate retaliation claims using an objective standard: retaliatory conduct is actionable if a reasonable employee would have found the challenged action materially adverse in that it produced an injury or harm which would dissuade a reasonable employee from making or supporting a charge of discrimination. *Burlington*, 548 U.S. at 68, 126 S. Ct. at 2415; *Henry v. Milwaukee Cty.*, 539 F.3d 573, 586 (7th

Cir. 2008). The language "materially adverse" separates "significant from trivial harms" and clarifies that adverse employment actions do not encompass "those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68, 126 S. Ct. at 2415; *see also Davis v. Time Warner Cable of So. Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011) ("Not everything that makes an employee unhappy is an actionable adverse action." (internal quotation omitted)). An adverse employment action must therefore be serious enough to dissuade a reasonable employee from engaging in a protected activity and must be more than "a mere inconvenience or an alteration in job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993); *see Henry*, 539 F.3d at 586.

Diab alleges that several adverse actions occurred upon her return to Kennedy in Fall 2010, after she filed her EEOC charge and lawsuit. She contends that she experienced more isolation from her peers in the social studies department. (Diab Dep. at 269.) Relatedly, she contends that Szkapiak was responsible for her transfer into the smaller bilingual department that year and then lied about having arranged the change. She alleges that Pawelczyk told her that she could no longer use the school's PA system to call security when her class became unruly. Diab also claims that she was constructively discharged when, on top of these events, Szkapiak reprimanded her for leaving the building during the December 3, 2010 staff development day and scrutinized her grading. (Resp. at 18.)

We begin with Diab's generalized feeling of isolation. Diab stated that she felt more isolation because she was not able to attend any social studies meetings, though she was not sure why. (Diab Dep. at 269.) The record does not indicate if perhaps she had a scheduling

conflict—or who might have been responsible for such scheduling.[23]  Regardless, Diab's extremely vague allegations about this isolation cannot amount to a materially adverse action.  In addition, we do not find it particularly surprising that she might not be included in social studies department meetings when she was no longer staffed in that department.  This lack of collaboration from her old department, to the extent she has described it, also does not constitute a materially adverse action.  (*See id.* at 271.)

We similarly cannot conclude that her transfer into the bilingual department rises to the level of materially adverse action, even in the retaliation context.  Diab does not dispute that she was qualified and certified to serve as an ESL teacher and that Szkapiak had the authority to transfer her to the bilingual department.  (*Id.* at 270–73.)  We agree with Diab that reassignments can be adverse actions under certain circumstances, *see, e.g.*, *Burlington*, 548 U.S. at 71, 126 S. Ct. at 2417, but she has not shown that such circumstances exist here.  Diab does not claim that her transfer to the bilingual department resulted in a loss of pay, benefits, hours, duties or prestige.  She does not claim that the transfer diminished her reputation or career advancement opportunities.  *Stephens v. Erickson*, 569 F.3d 779, 790–92 (7th Cir. 2009) ("Our decisions involving a transfer or reassignment of job responsibilities indicate that such an action is not materially adverse unless it represents a *significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects."); *see also Atanus v. Perry*, 520 F.3d 662, 677–78 (7th Cir. 2008).  While Diab was transferred to a

---

[23] As discussed earlier, Diab felt isolated in prior years because she could not attend meetings as a result of her teaching schedule.  (Section II.B., *supra* at 12 n.9.)  Because the timing is not clear from the record, we cannot determine whether that same schedule prevented her from attending meetings during the fall of 2010.

smaller department, she "continued to teach the same academic subject in the same building and under the same conditions after her reassignment." *Lucero*, 566 F.3d at 729 (rejecting plaintiff's argument that her reassignment from teaching seniors to teaching seventh grade English was a retaliatory adverse action). Diab obviously preferred to be part of the social studies department, but her transfer simply is not actionable retaliation.[24]

Next, Diab alleges that Pawelczyk warned her not to use the school's PA system any more to page security guards when students became disruptive. While we might agree with Diab that such conduct might constitute a materially adverse action, there is no evidence before us that Pawelczyk ever made this statement. Diab's only support for the statement is her unverified complaint. (*See* Pl.'s Facts ¶ 81 (citing Compl. ¶ 57).) At this procedural posture, however, neither Diab, nor the court, can rely on allegations from a complaint, as allegations are not considered admissible evidence. *Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011) ("Perhaps most troubling is the [appellants'] reliance on allegations made in their complaint as 'evidence' to support their claims on summary judgment."); *see Nisenbaum v. Milwaukee Cty.*, 333 F.3d 804, 810 (7th Cir. 2003) ("Allegations in a complaint are not evidence."); *DeGuzman v. Kalish*, No. 10 C 8066, 2011 WL 1378928, at *1 (N.D. Ill. Apr. 12, 2011). We scoured Diab's deposition transcript, though not required to do so, and found no reference to this incident. Ruiz's testimony—that she heard a rumor about Pawelczyk's warning to Diab and would not have been surprised if it were true—is not based on personal knowledge.[25]

---

[24] Szkapiak's evasiveness concerning who arranged for the transfer is inconsequential.

[25] Szkapiak's comment that he did not believe Pawelczyk would say something as alleged is similarly pointless. (Szkapiak Dep. at 189.)

(Ruiz Dep. at 112.)  As such, Diab has not raised a triable question of fact about this incident.

Finally, we turn to the events of December 3, 2010.  As described earlier, Diab alleges that Szkapiak retaliated against her by scrutinizing her grades and accusing her of improperly leaving the building early with another teacher, Duhig.  (*See* Resp. at 18.)  Neither of these developments amounts to a materially adverse action.  Diab acknowledged that it was not improper for Szkapiak to request to see her grades, which he did in response to student complaints about Diab's grading system.  (Diab Dep. at 232–33.)  Szkapiak's reprimand and request that Diab make up the hour she left school during the development day are also not materially adverse.  They are, at most, trivial irritations born of an apparent misunderstanding.

### B.      Causal Connection

Even if Szkapiak's December 3, 2010 conduct or Pawelczyk's alleged restriction on Diab's ability to use the PA constituted materially adverse actions, Diab has not established a causal connection sufficient to justify a trial on her retaliation claims.  Diab points only to the timing of these events to support her claim.  As the Seventh Circuit has frequently observed, "suspicious timing alone is almost always insufficient to survive summary judgment." *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011); *Burks*, 464 F.3d at 758–59; *Oest v. Ill. Dept. Corr.*, 240 F.3d 605, 616 (7th Cir. 2001).  Unless the "adverse impact comes 'on the heels' of the protected activity," additional evidence beyond suspicious timing is typically necessary for a factfinder to infer retaliatory motive.  *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (leaving the question of intent to the jury where defendant recommended plaintiff's termination the day after she complained about disability discrimination); *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) (leaving the

question of intent to the jury where defendant fired plaintiff on the spot as he presented a note describing alleged discriminatory treatment, and within about three weeks of his first complaint of discrimination); *see Coleman*, 2012 WL 32062, at *19.

Diab has offered no evidence establishing when Defendants learned of Diab's charge and lawsuit. For present purposes, we will assume that Defendants became aware of the lawsuit by the time school started, no later than mid-September 2010. Diab never alleged precisely when Pawelczyk directed her to stop using the PA, so a reasonable jury could not conclude that the comment followed "on the heels" of Defendants learning about her lawsuit. (Compl. ¶ 57.) Similarly, a jury could not infer retaliatory motive based on Szkapiak's decision to question Diab about her absence and grades several months after she filed her lawsuit and returned to Kennedy. Simply put, Diab has not "overcome the general rule that suspicious timing alone is insufficient." *Leitgen*, 630 F.3d at 675.

### C. Constructive Discharge

Moreover, no reasonable jury could agree with Diab that these events occurring in the Fall 2010 semester culminated in a retaliatory constructive discharge. To prove such a claim, Diab must show that "the abusive work environment became so intolerable that her resignation qualified as a fitting response." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134, 124 S. Ct. 2342, 2347 (2004); *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004). Unlike the hostile work environment analysis, there is no subjective component to this inquiry. *Suders*, 542 U.S. at 141, 147, 124 S. Ct. at 2351, 2354. Rather, the inquiry is whether "working conditions bec[a]me so intolerable that a reasonable person in the employee's position would have felt compelled to resign[.]" *Id.* The working conditions "must be even more egregious

than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress." *McPherson*, 379 F.3d at 441 (*quoting Robinson v. Sappington*, 351 F.3d 317, 336 (7th Cir. 2003)); *see also Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997). We have previously held that Diab's working conditions prior to the 2010–2011 school year did not amount to a hostile work environment. These additional charges against Szkapiak and Pawelczyk do not boost this claim over the very high hurdle set for constructive discharge allegations. She does not describe any abusive comments, threats of harm, disturbing physical contact or signs of imminent termination during this time period. *See, e.g.*, *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009); *Trimble v. Alliance-DeKalb/Rock-Tenn Co.*, 801 F. Supp. 2d 764, 778 (N.D. Ill. 2011); *King v. PMI-Eisenhart, LLC*, No. 09 C 0456, 2011 WL 635581, at *4–5 (N.D. Ill. Feb. 10, 2011); *Sacramento v. City of Chi.*, No. 07 C 4267, 2010 WL 2740305, at *12 (N.D. Ill. July 12, 2010). Even if the present allegations demonstrated an objectively unbearable working environment, Diab has not provided evidence that suggests any retaliatory motive. As discussed above, the timing of these events is not so suspicious as to warrant any inference of unlawful intent. Diab has not come forth with evidence of any comments or other indications that could lead a jury to infer that she was forced to resign because of Defendants' retaliatory conduct. In light of the above, Diab's retaliation claims are dismissed.

III.     **SECTION 1983**

We finally turn to Diab's claim against the Board pursuant to § 1983. In *Monell v. Department of Social Services*, the Supreme Court held that a local governmental unit can be directly liable under § 1983 when the "execution of a government's policy or custom" inflicts

the constitutional injury at issue in the case. 436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978). A

§ 1983 plaintiff therefore must show that "an official policy or custom not only caused the

constitutional violation, but was the 'moving force' behind it." *Estate of Sims v. Cty. of Bureau*,

506 F.3d 509, 514 (7th Cir. 2007). There are three methods by which a plaintiff can demonstrate

an official policy or custom: "(1) an express policy that causes a constitutional deprivation when

enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a

custom or practice; or (3) an allegation that the constitutional injury was caused by a person with

final policymaking authority." *Id.* at 515 (citing *Lewis v. City of Chi.*, 496 F.3d 645, 656 (7th

Cir. 2007)); *Phelan v. Cook Cty.*, 463 F.3d 773, 789 (7th Cir. 2006); *Zitzka v. Vill. of Westmont*,

743 F. Supp. 2d 887, 923 (N.D. Ill. 2010). We follow Diab's lead and focus exclusively on the

second theory of liability. (Resp. at 16.)

Diab contends that the Board repeatedly refused to address her complaints. She points

out that the Board failed to investigate the "Israel is doing OK" note and vandalism to her car in

January 2009. Diab also argues that the Employee Relations department did nothing in response

to her direct complaint about the allegedly discriminatory suspension imposed by Szkapiak in

January 2010. (*Id.*) The Seventh Circuit has recognized that "[i]f the same problem has arisen

many times and the municipality has acquiesced in the outcome, it is possible (though not

necessary) to infer that there is a policy at work." *Phelan*, 463 F.3d at 789 (quoting *Calhoun v.

Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)). Because "the word 'widespread' must be taken

seriously," a plaintiff "must introduce evidence demonstrating that the unlawful practice was so

pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy

decision." *Phelan*, 463 F.3d at 790; *Grieveson v. Anderson*, 538 F.3d 763, 773–75 (7th Cir.

2008); *Zitzka,* 743 F. Supp. 2d at 925.

Here, we find two holes in Diab's § 1983 argument. First, Diab has not articulated what widespread practice the Board allegedly condoned. (*See* Resp. at 16.) She has not specified, for example, that the Board made a habit of ignoring the discrimination complaints of older people, women, Muslims, Palestinians, or Arabs, or some combination thereof. Indeed, her brief and the record leave us with the impression that she felt the Board was targeting her personally—but not necessarily because of her protected characteristics.[26]

Second, Diab relies exclusively on her personal experiences in support of this claim. And while, as Diab notes, a plaintiff can rely on her own circumstances to establish the existence of a widespread practice, that task is necessarily difficult because "what is needed is evidence that there is a true municipal policy at issue, not a random event." *Grieveson*, 538 F.3d at 774 (quoting *Phelan*, 463 F.3d at 790). This avenue, as announced in *Phelan*, is very narrow. *See, e.g.*, *Cooper v. City of Chi. Heights*, No. 09 C 3452, 2011 WL 5104478, at *9–10 (N.D. Ill. Oct. 27, 2011). For example, the court in *Phelan* acknowledged that plaintiff could proceed with her claim based solely on her own experiences because she was the only woman with her job in her department, making it impossible for her to identify other victims of the alleged sexual harassment and gender discrimination. 463 F.3d at 789–90. The court went on to explain that, to prevail on this type of claim, plaintiffs relying on their specific situations must "weave th[o]se separate incidents together into a cognizable policy." *Phelan*, 463 F.3d at 790; *Zitzka,* 743 F. Supp. 2d at 925; *Dawson v. City of Chi.*, 648 F. Supp. 2d 1057, 1073 (N.D. Ill. 2009).

Unlike the plaintiff in *Phelan*, Diab is not the only older, Arab, Muslim or Palestinian

---

[26] Diab has not proposed a "class of one" theory. (*See* Resp. at 16.)

teacher at Kennedy.  (*See, e.g.*, Khairallah Dep. at 9; Hammad Dep. at 7–8, 49–50.)  Yet she has

neither alleged, nor shown, that the Board turned a blind eye to the complaints of others sharing

any of her protected characteristics.  *See, e.g.*, *Cooper*, 2011 WL 5104478, at *10 (finding that

the plaintiff could not rely exclusively on the victim's experiences where she was not the only

domestic violence victim in defendant's jurisdiction).  Moreover, a reasonable jury could not

find that the Board's apparent inaction amounts to a well-settled, permanent policy of

overlooking discrimination complaints.  *Phelan*, 463 F.3d at 791.  These three events are not

widespread or related so as to "truly evince the existence of a policy."  *Id.* at 790; *see Grieveson*,

538 F.3d at 774–74 (concluding that plaintiff's evidence of four incidents involving him did not

warrant an inference that the "*county itself* approved, acquiesced, or encouraged" the

misconduct).  Because Diab has not come forth with specific evidence of a widespread policy

knowingly accepted by the Board, she cannot prove that the Board is liable for a § 1983 *Monell*

claim.

## CONCLUSION

As set forth above, Defendants' motion is granted in part and denied in part.  We deny

the motion with respect to Diab's discrimination claim based on her two-day unpaid suspension.

The motion is granted as to all other claims.  Diab's motion to strike is denied as moot.  It is so

ordered.

_____
Honorable Marvin E. Aspen
U.S. District Court Judge

Dated: February 7, 2012